UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| TONGASS CONSERVATION SOCIETY; SIERRA CLUB; NATURAL RESOURCES DEFENSE COUNCIL; GREENPEACE, INC., CENTER FOR BIOLOGICAL DIVERSITY; and CASCADIA WILDLANDS PROJECT, | ) ) ) ) ) ) ) | |
|---|---|---|
| Plaintiffs, | ) ) | 1:09-cv-00003 JWS |
| vs. | ) ) | ORDER AND OPINION |
| FORREST COLE, in his official capacity as Forest Supervisor, Tongass National Forest; UNITED STATES FOREST SERVICE; and UNITED STATES DEPARTMENT OF AGRICULTURE, | ) ) ) ) ) ) ) ) | [Re: Motion at Docket 4] |
| Defendants. | ) ) | |

## I. MOTION PRESENTED

At docket 4, plaintiffs Tongass Conservation Society, *et al.* ("plaintiffs") move for a preliminary injunction against the Orion North Reoffer timber sale and its associated roads. At docket 10, defendants Forrest Cole, Forest Supervisor, Tongass National Forest, *et al.* ("the agencies") oppose the motion. Plaintiffs reply at docket 12. Oral argument was not requested, and it would not assist the court.

## II.  BACKGROUND

The subject of this action is the Orion North timber sale, which is a part of the Sea Level Timber Sale project in the Tongass National Forest.  In May 1999, the Forest Service issued a Final Environmental Impact Statement ("FEIS") for the Sea Level Timber Sale.  The "Purpose and Need" section of the FEIS stated that the Sea Level Timber Sale project was intended to meet objectives set forth in the Tongass Land Management Plan as revised in 1997 ("TLMP"), including:

- improve timber growth and productivity on suitable timber lands made available for timber harvest, and manage these lands for long-term sustained yield of timber,
- contribute to a timber supply to meet market demand, and
- provide opportunities for local employment in the wood-products industry, which in turn contribute to the local and regional economies of Southeast Alaska.[1]

On May 3, 1999, the Forest Service signed a Record of Decision ("ROD") authorizing the Sea Level Timber Sale and construction of necessary roads.  The Sea Level Timber Sale project, which is comprised of numerous timber sales, including the Orion North timber sale, is projected to harvest about 1,828 acres of commercial forest land, provide approximately 51 million board feet of timber, and involve reconstruction of 14 miles of existing road and construction of 29 miles of new road.[2]

The Orion North timber sale was previously awarded in 2003 and then canceled in 2007.[3]  In 2007, a settlement agreement in *Natural Resources Defense Council v. U.S. Forest Service*[4] prohibited logging in inventoried roadless areas, including Orion North, until after the Forest Service completed an amendment to the TLMP.  The settlement agreement specifically provided that the Forest Service would not offer Orion North for sale until 30 days after the TLMP Amendment was completed.  In January

---

[1] Doc. 10, exh. 1 at p. 4.

[2] Doc. 10, exh. 3 at p. 7.

[3] Doc. 4, exh. 37 at p. 3.

[4] Case Nos. 1:03-cv-0029 (JKS), 1:04-cv-0010 (JKS), 1:04-cv-0029 (JKS), and 1:06-cv-0005 (JKS).

2008, the Forest Service issued the FEIS and signed the ROD for the TLMP Amendment, with an effective date of March 17, 2008.

On May 14, 2008, the District Ranger for the Ketchikan/Misty Fjords Ranger District completed a Change Analysis advising the Forest Supervisor that the District was preparing to reoffer the Orion North timber sale authorized in the Sea Level Timber Sale ROD.[5] The Change Analysis concluded that "[n]o additional modifications have occurred that would result in additional environmental effects"[6] since a previous change analysis was completed in December 1999, and recommended that the Forest Supervisor find that the Orion North "Reoffer" timber sale was consistent with the Amended TLMP.

By letter dated September 9, 2008, plaintiffs requested the Forest Service to delay offering the Orion North Reoffer timber sale and road construction contract until after the Forest Service prepared a supplement to the Sea Level FEIS.[7] Plaintiffs argued that "revisions to the deer habitat capability model and developments related to wolf viability, invasive species, yellow cedar decline and climate change, changes in timber economics and market demand, endemism, and intact habitat present significant new information that should be analyzed in a supplemental environmental impact statement."[8] On September 19, 2008, the Forest Supervisor signed a Supplemental Information Report for the Orion North Reoffer timber sale, concluding that there was no significant new information that required preparation of a supplemental environmental impact statement ("SEIS").[9] On the same day, the Forest Service awarded a public-works roads contract "for the reconstruction and construction of specified roads

---

[5]Doc. 4, exh. 30 at p. 1.

[6]*Id.*

[7]Doc. 4, exh. 34 at p. 1.

[8]*Id.*

[9]Doc. 4, exh. 37 at p. 8.

-3-

necessary to access the timber required to be removed on the Orion North timber sale."[10]

On March 3, 2009, plaintiffs filed this action seeking declaratory and injunctive relief pursuant to 5 U.S.C. §§ 702, 706(2)(A) and 42 U.S.C. § 4332.[11] Plaintiffs request the court to "[e]nter a declaratory judgment that Defendants' decision to proceed with the Sea Level Roads contract and the Orion North Reoffer timber sale without preparing a supplement to the Sea Level FEIS was arbitrary, unreasonable and contrary to NEPA." Plaintiffs also request "preliminary and permanent injunctive relief to prevent implementation of the Sea Level roads and the Orion North Reoffer timber sale."[12] Plaintiffs also filed the underlying motion for preliminary injunction on March 3, 2009.[13]

The Orion North timber sale is one of the last sales to be implemented under the Sea Level FEIS and ROD. The Forest Service held a bid opening for the Orion North timber sale on April 14, 2009. Award of the sale to the highest bidder is expected to be completed on or about May 1, 2009.[14] The Forest Service has issued a suspension of work on Sea Level roads through the end of April 2009.

### III. APPLICABLE LEGAL STANDARDS

This action arises under the Administrative Procedures Act ("APA"), which provides for judicial review of final agency action.[15] Under the APA, the court "will reverse the agency action only if the action is arbitrary, capricious, an abuse of

---

[10]Doc. 10, exh. 3 at p. 6.

[11]Doc. 1.

[12]Doc. 1 at p. 10.

[13]Doc. 4.

[14]Doc. 15 at p. 2.

[15]5 U.S.C. §§ 701-706.

-4-

discretion, or otherwise contrary to law."[16]  "An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law."[17]  The determination of whether the agency acted in an arbitrary and capricious manner rests on whether it "articulated a rational connection between the facts found and the choice made."[18]  The scope of review is narrow, and the court may not substitute its judgment for that of the agency.[19]

"A preliminary injunction is an extraordinary remedy never awarded as of right."[20]  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[21]  In determining whether injunctive relief is appropriate, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[22]

---

[16] *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing 5 U.S.C. § 706(2)).

[17] *Id.* (internal citations omitted).

[18] *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1032 (9th Cir. 2008) (quoting *Pub. Citizen v. DOT*, 316 F.3d 1002, 1020 (9th Cir. 2003)).

[19] *Id.* (quoting *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000)).

[20] *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 376 (2008).

[21] *Winter*, 129 S. Ct. at 374.

[22] *Id.* at 376 (quoting *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

Case 1:09-cv-00003-JWS   Document 16   Filed 04/30/09   Page 5 of 17

## IV.  DISCUSSION

"NEPA is our basic national charter for protection of the environment."[23] "Although NEPA 'does not mandate particular results,' it does 'prescribe the necessary process.'"[24] "Through these procedural requirements, NEPA seeks to make certain that agencies 'will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger [public] audience.'"[25] NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."[26] The EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."[27]

Regulations implementing NEPA further require federal agencies to prepare a supplemental EIS ("SEIS") if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[28] "An agency is not required to prepare a SEIS every time new information comes to light."[29] "Rather, a SEIS is required only if changes, new information, or circumstances may result in significant environmental impacts 'in a manner not

---

[23]*North Idaho Community Action Network v. U.S. Dept. of Transportation,* 545 F.3d 1147, 1153 (9th Cir. 2008) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)).

[24]*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

[25]*North Idaho Community Action Network*, 545 F.3d at 1153.

[26]42 U.S.C. § 4332(2)(C).

[27]40 C.F.R. § 1502.1.

[28]40 C.F.R. § 1502.9 (c)(1)(ii).

[29]*North Idaho Community Action Network*, 545 F.3d at 1157 (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373 (1989)).

previously evaluated and considered.'"[30]  "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."[31]

NEPA requires agencies to take a "hard look" at the new information to determine whether a SEIS is necessary.[32]  In determining whether a SEIS is required, an agency may prepare an environmental report, such as an environmental assessment.  Here, the agencies prepared a supplemental information report ("SIR"), which is a "formal instrument[] for documenting whether new information is sufficiently significant to trigger the need for an SEIS."[33]

An agency's decision as to whether new information requires an SEIS is reviewed under the arbitrary or capricious standard.[34]  In reviewing a decision not to supplement an EIS, the court should carefully review the record and satisfy itself "that the agency has made a reasoned decision based on its evaluation of the significance - or lack of significance - of the new information."[35]

Plaintiffs argue that the agencies' decision to proceed with the Sea Level roads contract and the Orion North timber sale without preparing an SEIS violated NEPA. Plaintiffs base their arguments on five different categories of allegedly new information. First, plaintiffs argue that "significant changes in timber economics require supplemental analysis to fully inform the public and decisionmaker of the true costs of the Project."  In support, plaintiffs note that,

> ... in the Sea Level EIS, the Forest Service estimated the net stumpage value for Sea Level projects - the revenue the government could expect to get for selling

---

[30] *Marsh*, 490 U.S. at 373.

[31] *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1176-1177 (9th Cir. 1990) (citation and quotation omitted).

[32] *Id.* at 1177.

[33] *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 555 (9th Cir. 2000).

[34] *Headwaters*, 914 F.2d at 1177.

[35] *Id.* (quoting *Marsh*, 490 U.S. at 378) (internal quotation and citation omitted).

the timer - at $91/mbf. Just last year when the Forest Service advertised the Orion North Reoffer timber sale, however, the appraised value of the timber averaged only $33/mbf. By contrast, the cost of the road contract alone is $580,380, more than double the $214,450 appraised value of the timber sale. While the road cost alone dwarfs the value of the timber, it does not even include any of the substantial costs of planning, offering, and administering the sale. When those costs are included, losses will be much higher. In short, contrary to the representation in the Sea Level EIS, the Orion North Reoffer will not come anywhere close to breaking even.[36]

Plaintiffs further argue that the agencies' reliance on outdated economic information in the Sea Level EIS "skews the analysis of the costs and benefits of the project and presents misleading information to the public, frustrating the purpose of NEPA."[37] As evidence the agencies' failed to take a hard look at changes in timber economics, plaintiffs point out that the SIR does not mention the costs of the road or the anticipated revenue from the Orion North timber sale.

Citing *North Idaho Community Action Network v. U.S. Department of Transportation*, the agencies argue that NEPA does not require supplemental analysis for changed economic conditions, but rather "only if changes, new information, or circumstances may result in significant environmental impacts 'in a manner not previously evaluated and considered.'"[38] While plaintiffs concede that NEPA does not require an EIS to evaluate economic effects, plaintiffs argue that if an agency chooses to address economic effects in an EIS, that information must be accurate to allow for reasoned decisionmaking. In support, plaintiffs cite *Natural Resources Defense Council v. U.S. Forest Service*, a related case in which the Ninth Circuit held that the Forest Service's admitted misinterpretation of market demand for Tongass timber in its 1997 revision to the TLMP was a clear error of judgment that rendered the ROD arbitrary and capricious.[39] The court further held that "the market demand error was sufficiently

---

[36]Doc. 4 at p. 9 (internal citations to the record omitted).

[37]Doc. 4 at pp. 9-10.

[38]Doc. 10 at p. 18 (quoting *North Idaho Comm. Action,* 545 F.3d at 1157).

[39]421 F.3d 797 (9th Cir. 2005).

-8-

significant that it subverted NEPA's purpose of providing decision makers and the public with an accurate assessment of the information relevant to evaluate the Tongass Plan."[40] The court reasoned that the "Forest Service's error in assessing market demand fatally infected its balance of economic and environmental considerations, rendering the Plan for the Tongass arbitrary and capricious in violation of the APA."[41]

Here, plaintiffs similarly argue that including more accurate economic information in a SEIS could alter the weighing of the environmental and economic costs and benefits of the Orion North timber sale. However, this case is distinguishable from *Natural Resources Defense Council* which involved the duty to include accurate information in an EIS and ROD, not a duty to supplement economic information after a final EIS is completed. Plaintiffs do not cite any authority for the proposition that changes in timber economics require preparation of an SEIS.

The agencies argue that even assuming that NEPA requires evaluation of new economic information, the agencies met their burden. In support, the agencies note that the Sea Level FEIS discussed the estimated costs and benefits of the timber sales and that the SIR reconsidered "Timber Economics and Market Demand" and concluded that "[c]urrent appraisal for the Orion North Reoffer is net positive."[42]

The evidence also shows that the agencies further analyzed the changes in timber economics since this action commenced.[43] In support of their opposition to the motion for preliminary injunction, defendants filed the declaration of Forrest Cole, Forest Supervisor for the Tongass National Forest, Alaska Region. Cole's declaration, which is dated March 17, 2009, states in pertinent part:

> Increases in fuel costs and manufacturing costs, along with decreases in values of the end products, have rendered uneconomical in today's market the Upper

---

[40] *Id.* at 812.

[41] *Id.* at 816.

[42] Doc. 4, exh. 37 at p. 8.

[43] *Friends of the Clearwater*, 222 F.3d at 560 (concluding that supplemental material submitted by the Forest Service was properly before the court and must be considered in determining whether plaintiffs were entitled to the injunctive relief sought).

> Carroll II sale, the Buckdance Madder sale, and the Licking Creek sale. The Orion North sale appraises positive. Moreover, if the purchaser of the above-mentioned sales also purchases the Orion North sale, he may combine the economical timber from this sale with the uneconomical timber from other sales and recoup some of the loss that may be experienced in this market.[44]
>
> ....I am aware that the timber industry considers the Orion North timber sale to be a "good" sale in that it is better than average in terms of economics and timber quality. The sale is appraised positively, and the price for stumpage that a purchaser would pay for the sale will be higher as a result of the construction of the public-works road described in paragraph [10] below.[45]

In his declaration, Mr. Cole also discusses the opportunities for local employment in the wood-products industry, which is one of the purposes identified in the Sea Level FEIS and in the TLMP.

Assuming without deciding that NEPA requires supplemental analysis for changed economic conditions, the court concludes that the agencies have taken a hard look at changes in timber economics and that their determination that an SEIS is not required is not arbitrary and capricious. "An agency need only articulate a rational connection between the facts it has found and it conclusions."[46] The agencies have done so here, and even if the court disagreed with their conclusion, the court could not substitute its judgment for that of the agencies.[47]

Second, plaintiffs argue that "changes in the deer and wolf model provide significant new information about the environmental effects of the project" which necessitates supplemental analysis. The agencies contend that supplemental analysis is not required because 1) a change in the method of analysis is not "significant new information" as contemplated by NEPA; 2) some of the allegedly new information was considered in the 1998 draft Sea Level EIS; and 3) even if the model change amounts to new information, the "Forest Service reasonably concluded, based on the Final Sea

---

[44]Doc. 10, exh. 3 at p. 3.

[45]Doc. 10, exh. 3 at p. 3.

[46]*Friends of the Clearwater*, 222 F.3d at 561.

[47]*Id.*

-10-

Level EIS and the later analysis in the TLMP Amendment EIS, that there is no significant new information relevant to wolf viability requiring supplemental analysis."[48]

Based on its review of the record, the court concludes that the agencies took the requisite hard look at changes in the deer and wolf model before concluding that preparation of a SEIS was not necessary. The SIR acknowledges that changes in the deer and wolf model used for the TLMP Amendment "resulted in a more conservative estimate of deer habitat capability than was estimated in the 1997 Forest Plan." However, the SIR concludes that "[e]ven with these lower estimates of deer habitat capability, the [Amended TLMP] was determined to have a high likelihood of maintaining viable wolf populations on the Tongass."[49] Moreover, the SIR states that "[w]olf viability is determined for the entire Tongass, not at a project scale,"[50] and that because the Orion North Reoffer timber sale is consistent with the 2008 TLMP, it is consistent with the 2008 TLMP's viability determinations.

As discussed above, "a SEIS is required only if changes, new information, or circumstances may result in significant environmental impacts 'in a manner not previously evaluated and considered.'"[51] Here, the court cannot conclude that the agencies' decision that an SEIS was not required was arbitrary or capricious because the agencies previously evaluated and considered changes in the wolf and deer models in the Sea Level FEIS, 2008 TLMP Amendment EIS, and in the SIR, and reasonably concluded that the Orion North sale would not significantly affect the environment in a manner not previously analyzed.

Plaintiffs next argue that even assuming the 2008 TLMP Amendment EIS's analysis of viability is adequate, "the forest wide analysis does not excuse the Forest

---

[48]Doc. 10 at p. 12.

[49]Doc. 4, exh. 37 at p. 5.

[50]*Id.*

[51]*North Idaho Community Action Network*, 545 F.3d at 1153 (quoting *Westlands Water Dist. v. Dept. of Interior*, 376 F.3d 853, 873 (9th Cir. 2004) (citation omitted)).

-11-

Service from conducting a site-specific analysis of the effects of this project."[52] Plaintiffs do not cite, nor is the court aware of, any authority supporting their argument. Rather, the Ninth Circuit has held that "[w]here an environmental impact is 'encompassed by the terms of the [regional] EIS,' its site-specific effects 'd[o] not constitute significant new circumstances requiring a supplemental EIS under 40 C.F.R. §1502.9(c)(2)(ii).'"[53]

Third, plaintiffs argue that new information tying the decline of yellow cedar to climate change and "management measures to address decline in a warming climate" should have been analyzed in a SEIS.[54] Plaintiffs specifically argue that in light of recent studies by the Forest Service, "timber sales should include measures to address yellow cedar decline, including replanting yellow cedar in areas where it will survive in a warming climate, avoiding logging healthy yellow cedar, and cutting only dead yellow cedar."[55] As support that an SEIS should be prepared to include management measures, plaintiffs attach the 2008 EIS for the Iyouktug Timber Sales, which provides for planting yellow cedar "in specific units judged to have favorable site characteristics for long-term survival and growth."[56]

The agencies argue that the Forest Service considered the issue of climate change on yellow cedar and reasonably concluded that a SEIS was not required to address the issue. The agencies point out that the SIR specifically addressed the issue of climate change and yellow cedar. The SIR noted that the Sea Level FEIS recognized yellow cedar as a "minor component within the project area." The SIR also indicated that 2008 TLMP Amendment FEIS addressed yellow cedar decline and climate change, recognizing that "cedar decline is likely to continue to spread if climate were to continue to warm." The SIR further indicated that climate change is difficult to assess at the

---

[52]Doc. 12 at p. 6.

[53]*Headwaters*, 914 F.2d at 1178.

[54]Doc. 4 at p. 17.

[55]Doc. 12 at p. 8.

[56]Doc. 4, exh. 26 at p. 15.

-12-

project level, and management of the Tongass in the face of anticipated climate change "will be done through maintaining mostly intact ecosystems."[57] The SIR also cited the Forest Plan ROD, which requires replanting yellow cedar in several units of the Sea Level project similar to the requirement for replanting in the Iyouktug Timber Sales EIS.[58]

Based on its review of the record, the court is satisfied that the agencies conducted a reasoned evaluation of the relevant information concerning climate change and yellow cedar decline and determined that it was not of such significance that a SEIS was required. Accordingly, the court concludes that the agencies' determination was not arbitrary or capricious.

Fourth, plaintiffs contend that significant new information about endemics should be analyzed in a SEIS. Plaintiffs define endemics as plant or animal species "that are native and restricted in their distribution to an island, a portion of Southeast Alaska, or Southeast Alaska."[59] Plaintiffs specifically argue that the Forest Service failed to consider new information "showing that red-backed voles depend on old growth habitat to support breeding populations."[60] Plaintiffs also argue that wolverines, which have been found on Revilla Island, were not mentioned in the Sea Level EIS and that the "potential effects to wolverines should therefore be analyzed in a [SEIS]."[61] Plaintiffs acknowledge, however, that wolverines are not considered an endemic species.

The agencies argue that there is no significant new information about endemic species requiring a SEIS. The agencies point out that the Sea Level FEIS identified the red-backed vole as an endemic species and concluded that they were "ubiquitous with

---

[57]Doc. 4, exh. 37 at p. 7.

[58]Doc. 4, exh. 3 at pp. 13, 15, 17, and 19.

[59]Doc. 4 at p. 18.

[60]Doc. 12 at p. 10.

[61]Doc. 4 at p. 19.

-13-

generalized habitat requirements."[62] In response to plaintiffs' contentions that new studies show that red-backed voles are associated with old-growth coniferous forests, are sensitive to habitat fragmentation, and depend on old growth habitat to support breeding populations, the agencies argue that the Sea Level FEIS addressed these concerns. The Sea Level FEIS concluded that "most of Revillagigedo Island will remain as habitat in old growth habitat reserves, beach and estuary buffers, primitive recreation areas, and Misty F[j]ords National Monument wilderness" and that "[p]opulation viability will be maintained through these designations and other Standards and Guidelines in the Forest Plan."[63] The Sea Level FEIS further concluded that "[t]he Sea Level Project meets the TLMP objective of maintaining habitat to support viable populations of endemic terrestrial mammals."[64]

The agencies further argue that the information cited by plaintiffs is not new, but rather reflects information from studies conducted in 1984, 1988, 1991, and 1999. In addition, the agencies note that the 2005 Forest Service study cited by plaintiff indicates that a 2004 study showed that recently thinned young growth may be suitable for supporting breeding populations of red-backed voles.[65]

As to plaintiffs' argument that impacts on wolverines should be analyzed in a SEIS, the agencies argue that other than noting that wolverines are located on Revilla Island, plaintiffs have not identified any new information or changed circumstances regarding potential impacts to wolverines requiring supplemental analysis. Moreover, the SIR specifically addressed endemism and concluded that a revision or supplement to the Sea Level FEIS is not warranted at this time. The SIR states in pertinent part:

> Endemics were discussed in Sea Level Timber Sale EIS and since the project was consistent with the 1997 Plan and endemic standard and guidelines did not substantially change in the 2008 Forest Plan, habitat to support viable

---

[62]Doc. 10 at p. 15.

[63]Doc. 4, exh. 2 at p. 61.

[64]*Id.*

[65]Doc. 4, exh. 12 at p. 11.

-14-

populations of endemic mammals Forest-wide would be maintained with implementation of this project.[66]

Here, because analysis of the relevant documents "requires a high level of technical expertise," the court defers to "the informed discretion of the responsible federal agencies."[67] In doing so, the court concludes that the agencies took the requisite hard look at information regarding endemics, and that their determination that a SEIS is not required was not arbitrary and capricious.

Finally, plaintiffs argue that invasive species should be analyzed in a SEIS. In support, plaintiffs note that in an invasive species risk assessment the Forest Service completed for the Orion North timber sale at the same time it completed the SIR, the Forest Service concluded that "[i]f mitigation measures are implemented, the proposed action is likely to result in moderate risk of spread of existing populations of invasive species along road corridors and low risk of spread into habitats not disturbed by human activity."[68] Plaintiffs argue that the Forest Service's conclusion "effectively concedes that the logging and road construction 'may' have significant effects."[69]

The agencies argue that plaintiffs cite no authority for the proposition that a "moderate risk" amounts to a "significant environmental impact" requiring a SEIS. The agencies further contend that plaintiffs' discussion of the risk assessment is misleading. The court concurs. On September 18, 2008, the Forest Service completed a Risk Assessment for Invasive Plants for the Orion North Timber Sale. While the risk assessment identified five non-native plants along the existing road system, it identified only one plant, reed canary grass, as an invasive species. The assessment indicated that reed canary grass is "not a high priority for control" because it is well established and widespread throughout the Tongass National Forest and "eradication would be

---

[66] Doc. 4, exh. 37 at p. 8.

[67] *Marsh*, 490 U.S. at 377 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).

[68] Doc 4, exh. 35 at p. 9.

[69] Doc. 4 at p. 21.

Case 1:09-cv-00003-JWS   Document 16   Filed 04/30/09   Page 15 of 17

impossible to achieve."[70]  In order not to facilitate its spread, however, the risk assessment indicated that contract provisions will include management and mitigation provisions, such as requiring off-road equipment to be cleaned of contaminated soil prior to transport and using rock from non-contaminated sites away from the existing road.[71]

In addition, the SIR specifically considered the information about invasive species provided in the risk assessment.  The SIR concluded that while the  proposed action is likely to result in moderate risk of the spread of existing populations of invasive species along road corridors and low risk of spread into habitats not disturbed by human activity, "[a]ppropriate mitigation measures are included in the Orion North Reoffer Timber Sale Contract under current contract clauses."[72]

"When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require [a SEIS]."[73]  Here, based on the analysis conducted in the risk assessment and the SIR, it is clear that the agencies took the requisite hard look at new information regarding invasive species and made a reasoned determination that it was not of such significance as to require an SEIS.  Consequently, the agencies' decision not to prepare a SEIS was not arbitrary or capricious.

Under the test for injunctive relief, plaintiffs must show that they are likely to succeed on the merits.  For the reasons set forth above, plaintiffs have failed to make a showing that they are likely to succeed on the merits of any of their proffered arguments.  Accordingly, the court will deny plaintiffs' motion for a preliminary injunction.

---

[70]Doc. 4, exh. 35 at p. 5.

[71]Doc. 4, exh. 35 at p. 8.

[72]Doc. 4, exh. 37 at p. 7.

[73]*Friends of the Clearwater*, 222 F.3d at 558 (quoting *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980)).

Case 1:09-cv-00003-JWS   Document 16   Filed 04/30/09   Page 16 of 17

## V. CONCLUSION

For the reasons set out above, plaintiffs' motion for preliminary injunction at docket 4 is **DENIED**.

DATED at Anchorage, Alaska, this 30th day of April 2009.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE